## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER THURMOND, KATHY MULL, DIANE FORREST and JEANNE RYAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SUNTRUST BANKS, INC., SUNTRUST BANK, SUNTRUST MORTGAGE, INC., TWIN RIVERS INSURANCE COMPANY<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

### INTRODUCTION

1.      SunTrust Banks, Inc., one of the nation's largest commercial banking organizations, together with certain participating subsidiaries and/or affiliates, including SunTrust Bank and SunTrust Mortgage, Inc. ("SunTrust Mortgage") (collectively referred to herein as "SunTrust" or the "Company"), has acted in concert with its affiliated reinsurer, Twin Rivers Insurance Company ("Twin Rivers") (together with SunTrust, "Defendants"), to effectuate a captive reinsurance scheme whereby, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (a) illegal referral payments in the form of purported reinsurance premiums are paid by private mortgage insurers to Twin Rivers; and (b) Defendants receive an unlawful split of private mortgage insurance premiums paid by SunTrust's customers.

2.      This is a proposed nationwide action brought by Plaintiffs Christopher Thurmond, Kathy Mull, Diane Forrest, and Jeanne Ryan (collectively referred to herein as "Plaintiffs") on behalf of themselves and a class of all other similarly situated homeowners who obtained residential mortgage loans originated or acquired by SunTrust or any of its subsidiaries and/or

affiliates between January 1, 2004 and the present (the "Class Period") and, in connection therewith, purchased private mortgage insurance and whose loans were included within SunTrust's captive reinsurance arrangements (hereinafter, the "Class").

3.      In this action, Plaintiffs challenge a hidden conspiracy to circumvent RESPA's strict prohibition against kickbacks and unearned fees and seek statutory damages and/or restitution for Defendants' unjust enrichment.   Members of the conspiracy included each Defendant and unnamed co-conspirator private mortgage insurers.

4.      Homeowners who buy a home with less than a 20% down payment are typically required to pay for private mortgage insurance.   *See* http://www.privatemi.com.   Private mortgage insurance protects the lender in the event of a default by the borrower.   *Id.  See also* Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements" at p. 1, attached hereto as Exhibit A, discussing the purpose of mortgage insurance.   Although the premium is paid by the borrower (either directly or indirectly, as further described below), borrowers typically have no opportunity to comparison-shop or select the private mortgage insurer.

5.      Section 2607 of RESPA prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance.   Thus, a lender cannot legally accept a referral fee from the insurer issuing the private mortgage insurance policy on the borrower's home.

6.      SunTrust has attempted to circumvent RESPA's prohibition against accepting kickbacks and unearned fees by arranging for the private mortgage insurer to pay a portion of borrowers' private mortgage insurance premiums to Twin Rivers in the form of purported "reinsurance" premiums.

2

7.     While these payments to Twin Rivers are purportedly for "reinsurance" services, Twin Rivers receives these payments while assuming very little or no actual risk under its contracts with private mortgage insurers.  For instance, from the beginning of 2004 through the end of 2008, SunTrust's captive reinsurer received over **$168 million** from leading primary mortgage insurers as its "split" of borrowers' mortgage insurance premiums—well over $50 million in 2008 alone.  In stark contrast, its actual paid losses during this time, as reflected in the total amount of claims paid, were **zero**.  During 2009, although Twin Rivers "paid" at least $7 million in "losses," the premiums that it received (or "price paid" for reinsurance during the relevant time period) were far from commensurate with the risk it assumed.  In other words, the millions of dollars collected by SunTrust through its captive reinsurance arrangements far exceeded the value of any services rendered.

8.     This scheme constitutes disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in one or more of Plaintiffs' mortgage loan transactions is located in this district, Defendants reside in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

### Plaintiffs

11.     Plaintiff Christopher Thurmond obtained a mortgage loan from SunTrust

3

Mortgage on or about May 16, 2007 for the purchase of his home located in Philadelphia, PA.  In connection with his loan, Plaintiff Thurmond was required to pay for private mortgage insurance. The private mortgage insurance provider was selected by SunTrust and was a provider with whom SunTrust had a captive reinsurance arrangement.  Plaintiff Thurmond was required to pay a private mortgage insurance premium in the amount of $203 per month.

12.     Plaintiff Kathy Mull obtained a mortgage loan from SunTrust Mortgage on or about May 7, 2008 for the purchase of her home located in Hummelstown, PA.  In connection with her loan, Plaintiff Mull was required to pay for private mortgage insurance.  The private mortgage insurance provider was selected by SunTrust and was a provider with whom SunTrust had a captive reinsurance arrangement.  The premium for the private mortgage insurance was $1,579.44, which was initially paid as a lump sum by SunTrust and then passed on to Plaintiff Mull in the form of a higher interest rate for her loan.

13.     Plaintiff Jeanne Ryan obtained a mortgage loan from SunTrust Mortgage on or about May 3, 2007 for the purchase of her home located in Ligonier, PA.  In connection with her loan, Plaintiff Ryan was required to pay for private mortgage insurance.  The private mortgage insurance provider was selected by SunTrust and was a provider with whom SunTrust had a captive reinsurance arrangement.   Plaintiff Ryan was required to pay a private mortgage insurance premium in the amount of $139.50 per month.

14.     Plaintiff Diane Forrest obtained a mortgage loan from SunTrust Mortgage on or about February 27, 2007 for the purchase of her home located in Washington, D.C.   In connection with her loan, Plaintiff Forrest was required to pay for private mortgage insurance. The private mortgage insurance provider was selected by SunTrust and was a provider with whom SunTrust had a captive reinsurance arrangement.  Plaintiff Forrest was required to pay a

private mortgage insurance premium in the amount of $115.00 per month.

**Defendants**

15.     Defendant SunTrust Banks, Inc. was incorporated in 1984 under the laws of the State of Georgia and is headquartered in Atlanta, Georgia. *See* SunTrust Banks, Inc. 2009 Form 10-K Annual Report (filed February 23, 2010) at p. 1.

16.     Defendant SunTrust Bank, a Georgia state chartered bank, is the flagship subsidiary of SunTrust Banks, Inc. *Id.*

17.     Defendant SunTrust Mortgage, Inc. is a wholly-owned subsidiary of SunTrust Bank. *Id.* at Exhibit 21, p. 5.

18.     Defendant Twin Rivers Insurance Company is a wholly-owned subsidiary of SunTrust Bank. *Id.* at Exhibit 21, p. 6. From August 13, 1997 through July 2, 2007, SunTrust's captive reinsurance subsidiary was known as Cherokee Insurance Company ("Cherokee"). Cherokee was a Vermont corporation and a wholly-owned subsidiary of SunTrust Mortgage. *See* Vermont Secretary of State Corporation Information for Cherokee, available at: http://cgi3.sec.state.vt.us/cgi-shl/nhayer.exe?corpbrow?form_id=corpname?corpnu mb=V591570. *See also* SunTrust Banks, Inc. 2007 Form 10-K Annual Report (filed February 20, 2008) at p. 61. On or about July 2, 2007, Cherokee was redomesticated to South Carolina and renamed as Twin Rivers. *See* South Carolina Secretary of State Corporate History Record for Twin Rivers, available at:

http://www.scsos.com/index.asp?n=18&p=4&s=18&corporateid=484650.

19.     Each Defendant is a proper party to this action as, upon information and belief, each Defendant was and is a recipient of the unlawful kickbacks and unearned fees described herein. Under RESPA Sections 8(a) and 8(b), 12 U.S.C. §§ 2607(a) and (b), it is unlawful for *any* person to accept any fee, kickback, or thing of value for the referral of private mortgage

5

insurance or any portion of an unearned fee and, further, Section 8(d) of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for three times the amount paid for the settlement service.

## FACTUAL ALLEGATIONS

### SunTrust's Operations

20.     SunTrust Banks, Inc. is a diversified financial services holding company, whose businesses provide a broad range of financial services to consumer and corporate customers. As of December 31, 2010, SunTrust Banks, Inc. held $172.9 billion in assets. *See* SunTrust Banks, Inc. Form 8-K Current Report (filed January 21, 2011), at p. 5.

21.     SunTrust Bank provides deposit, credit, and trust and investment services through branches and automated teller machines located in Georgia, Florida, the District of Columbia, Maryland, Virginia, North Carolina, South Carolina, Tennessee, Alabama, West Virginia, Mississippi, and Arkansas. *See* SunTrust Banks, Inc. 2009 Form 10-K Annual Report (filed February 23, 2010), at p. 1.

22.     SunTrust Mortgage originates and purchases residential mortgage loans through over 200 locations in SunTrust markets and adjacent states and, during the Class Period, maintained correspondent and broker relationships in 49 states and serviced loans in 50 states and the District of Columbia. *See* http://www.linkedin.com/company/suntrust-mortgage.

23.     Through its subsidiary Twin Rivers, SunTrust enters into agreements to provide purported reinsurance services to primary private mortgage insurance providers with respect to mortgage loans originated, funded and/or serviced by SunTrust. *See* SunTrust Banks, Inc. 2008 Form 10-K Annual Report (filed March 2, 2009), at p. 8.

### Private Mortgage Insurance Industry

24.     In order to lessen risk of default, lenders typically prefer to finance no more than

eighty percent (80%) of the value of a home, with the remaining twenty percent (20%) being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

25.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home.  Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party—the private mortgage insurer—to protect the lender in the event of a default by the borrower.  *See* http://www.privatemi.com/news/fact

sheets/2010-2011.pdf.  *See also* Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements" at pp. 1-2, attached hereto as Exhibit A, discussing the purpose of mortgage insurance.

26.     Private mortgage insurers are typically unaffiliated third-party companies who agree to cover the first twenty to thirty percent of the amount of the potential claim, including unpaid principal, interest and certain expenses.  *Id.*

27.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the more mortgage insurance required.  *See* http://www.privatemi.com/toolsresources/faqs.cfm.  For example, more private mortgage insurance is required with a five percent down payment than with a fifteen percent down payment.

28.     While the lender is the beneficiary of the private mortgage insurance, the borrower pays for the insurance, either (a) directly through the addition of monthly premiums to the borrower's monthly mortgage payment or (b) indirectly through a higher interest rate on the loan (the lender pays the initial private mortgage insurance premium as a lump sum and then

passes this cost on the borrower in the form of a higher interest rate for the life of the loan).

29.     Borrowers generally have no opportunity to comparison-shop for private mortgage insurance, as the private mortgage insurance is arranged by the lender. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the private mortgage insurer, rather than negotiated between the borrower and the private mortgage insurer. *See, e.g.*, http://www.privatemi.com/toolsresources/faqs.cfm.

30.     The private mortgage insurance industry began with the founding of Mortgage Guaranty Insurance Corporation ("MGIC") in 1957 and grew to become dominated by MGIC and other companies, including, without limitation: Genworth Mortgage Insurance Corporation, PMI Mortgage Insurance Company, Radian Guaranty Inc., Republic Mortgage Insurance Company, Triad Guaranty Insurance Corporation ("Triad"), and United Guaranty Residential Insurance Company. Generally, the industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA"). *See* http://www.privatemi.com/news /index.cfm. According to its website, MICA's members include each of the foregoing insurers, with the exception of Triad[1]. *See* http://www.privatemi.com/news/factsheets/2010-2011.pdf.

31.     According to MICA, new private mortgage insurance contracts for its member firms consistently exceeded $200 billion between 1998 and 2006 and topped $300 billion in 2007. *See Id.*

32.     Private mortgage insurance is limited to the conventional home loan market. Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration, the Department of Veterans Affairs and the Department of Agriculture maintain their own form of mortgage default

---

[1]      Triad ceased issuing commitments for new business on July 15, 2008 and entered into voluntary run-off. *See* http://www.tgic.com/.

insurance. *See* http://www.privatemi.com/news/factsheets/2010-2011.pdf.

### RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Private Mortgage Insurance Policies

33.     RESPA is the primary federal law regulating residential mortgage settlement services.   The United States Department of Housing and Urban Development ("HUD") is charged with enforcing RESPA.  HUD has promulgated the implementing rules for RESPA.  See Regulation X, 24 C.F.R. § 3500.

34.     RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers.   "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result…in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."  12 U.S.C. § 2601(b).

35.     A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

36.     RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

37.     RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

38.     Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates

9

this section." 24 C.F.R. § 3500.14(c).

39.     The term "thing of value" is broadly defined in RESPA and further described in

Regulation X as including:

> without limitation, monies, things, discounts, salaries,
> commissions, fees, duplicate payments of a charge, stock,
> dividends, distributions of partnership profits, franchise royalties,
> credits representing monies that may be paid at a future date, the
> opportunity to participate in a money-making program, retained or
> increased earnings, increased equity in a parent or subsidiary
> entity…The term payment is used as synonymous with the giving
> or receiving any "thing of value" and does not require transfer of
> money.

24. C.F.R. § 3500.14(d).

40.     Private mortgage insurance business referred to private mortgage insurers by a

lender constitutes "business incident to or a part of a real estate settlement service" within the

meaning of RESPA, 12 U.S.C. § 2607(a).  The term "settlement service" is liberally defined in

RESPA and Regulation X and includes the "provision of services involving mortgage

insurance." 24 C.F.R. § 3500.2(b).

41.     Under RESPA, therefore, SunTrust is prohibited from accepting referral fees from

a private mortgage insurer or from splitting private mortgage insurance premiums with the

insurer other than for services actually performed by the captive reinsurer.

**Mortgage Reinsurance Industry**

42.     Private mortgage insurers commonly enter into contracts with reinsurers, whereby

the reinsurer typically agrees to assume a portion of the private mortgage insurer's risk with

respect to a given pool of loans.  In return, the private mortgage insurer cedes to the reinsurer a

portion of the premiums it receives from borrowers with respect to the loans involved.

43.     Mortgage reinsurance arrangements can generally take one of two forms: (a)

"quota share" or (b) "excess of loss."

44.     In a quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences losses, the reinsurer is expected to experience losses in the percentage agreed upon in the reinsurance agreement.

45.     Unlike the quota share arrangement, however, the excess of loss method does not necessarily result in any actual "losses" being shifted to the reinsurer.

46.     This is because, in an excess of loss reinsurance arrangement, the reinsurer is liable only for a specified corridor or "band" of loss, with the losses below and above the band being covered by the private mortgage insurer.  In other words, the reinsurer is liable only for claims, or a percentage thereof, above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly known as a detachment or exit point.  Under this structure, then, the reinsurer's liability begins, if ever, only when the primary private mortgage insurer's incurred losses and expenses reach the attachment point and ends when such losses reach the detachment point.

47.     The likelihood of the reinsurer experiencing any real losses under this arrangement depends not only on the amount of losses paid by the private mortgage insurer as a result of borrower default, but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer constitutes real or commensurately priced reinsurance such that the reinsurer is *required* to contribute its *own* money when called upon by the private mortgage insurer to pay for its share of losses.

### Captive Mortgage Reinsurance Arrangements and HUD's Concern About RESPA Anti-kickback Violations Under Such Arrangements

48.     Lenders produce customers for private mortgage insurers.  Certain lenders, seeking to capitalize on the billions of dollars their borrowers pay to these insurers in premiums

each year, have established their own affiliated or "captive" reinsurers. *See* article authored by Michael C. Schmitz, *Investigating Captive Mortgage Reinsurance*, CBS MoneyWatch.com (February 1, 1998), available at: http://findarticles.com/p/articles/mi_hb5246/is_n5_v58/ai_n28702767//?tag=content;col1. These captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates that include private mortgage insurance.

49.     Under "captive reinsurance arrangements," the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.   These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer.

50.     Captive mortgage reinsurance arrangements raise obvious RESPA kickback problems.  Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the borrower's premium revenue through its captive reinsurer.   The insurer stimulates/guarantees its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

51.     Simply put, as opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, an unscrupulous lender can use a carefully crafted excess-of-loss captive reinsurance arrangement to funnel such unlawful kickbacks from the private mortgage insurer to the lender's captive reinsurance subsidiary.

52.     Concerned that these transactions would be designed to disguise a funneling of referral fees back to the lender who arranged for the private mortgage insurer to obtain the business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of captive reinsurers and RESPA's anti-kickback violations. *See* HUD Letter, attached as Exhibit B

hereto.

53.     The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original). *See Id.*

54.     The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk." HUD warned that "The reinsurance transaction cannot be a sham under which premium payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims." *Id.*

55.     The HUD letter also states "This requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to participate <u>pro rata</u> in every claim" (emphasis in original).[2] *Id.*

56.     The HUD letter contrasts the excess of loss method of captive mortgage reinsurance. HUD states that excess of loss reinsurance contracts can escape characterization as an unlawful referral fee or fee-split only:

> . . . if the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band. Unless there is a real transfer of risk, no real reinsurance services are actually being provided. In either case, the premiums paid...must be commensurate with the risk.

*Id.* Notably, state insurance commissioners and federal regulators have investigated and condemned similar captive reinsurance arrangements in the title insurance industry as sham

---

[2]     However, quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance agreement limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers.

transactions designed to funnel unlawful kickbacks for business referrals. *See, e.g.*, Broderick Perkins, *Title Insurance Industry in Hot Water with Regulators Again*, San Jose Business Journal (May 22, 2005), available at:

http://www.bizjournals.com/sanjose/stories/2005/05/23/story4.html.

57.     Indeed, while announcing a $37.8 million settlement with nine title insurers, then California Insurance Commissioner John Garamendi stated, "This reinsurance scheme appears to be nothing more than a form of commercial bribery."  Press Release, California Department of Insurance (July 20, 2005), available at: http://www.departmentofinsurance.ca.gov/0400-news/0100-press-releases/0080-2005/release069-05.cfm.   As a result, a number of providers have abandoned such arrangements altogether.

58.     The National Association of Insurance Commissioners ("NAIC") also has addressed the accounting treatment of premiums ceded to captive reinsurers.  Under the annual statement requirements of the NAIC, private mortgage insurers should not treat as authorized reinsurance amounts ceded to lender-captive reinsurers where adequate risk is not transferred. Rather, such amounts should be accounted for under the less beneficial deposit accounting guidelines and identified as though unauthorized accounting was being utilized.   *See* http://www.naic.org/documents/topics_finite_re_12-pcrsg4B.doc   -   2010-07-23.   *See   also* Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements" at p. 5, attached hereto as Exhibit A (stating that if adequate risk transfer is not present, deposit accounting principles must be applied).

### SunTrust's Captive Reinsurance Arrangements

59.     In connection with the billions of dollars in home loans originated by SunTrust, many of its borrowers pay for private mortgage insurance.

60.     Beginning as early as August 1997, SunTrust entered into "captive reinsurance

arrangements," whereby it referred its borrowers to private mortgage insurers, who agreed to reinsure with Twin Rivers under excess of loss reinsurance agreements. These insurers included at least: Genworth Mortgage Insurance Corporation, Mortgage Guaranty Insurance Corporation, PMI Mortgage Insurance Company, Radian Guaranty Inc., Republic Mortgage Insurance Company, Triad Guaranty Insurance Corporation, and United Guaranty Residential Insurance Company.

61.   SunTrust has a strong financial interest in referring business to private mortgage insurers who, in turn, agree to reinsure with Twin Rivers on terms that will likely produce significant monetary benefits to SunTrust. As of December 31, 2009, approximately $15.1 billion of mortgage loans were covered by SunTrust's captive mortgage reinsurance contracts. *See* SunTrust Banks, Inc. 2009 Form 10-K Annual Report (filed February 23, 2010), at p. 134.

62.   Upon information and belief, Twin Rivers entered into reinsurance agreements solely with respect to loans originated or acquired by SunTrust.

63.   Under each of SunTrust's captive reinsurance arrangements, the private mortgage insurer pays Twin Rivers a percentage of the premiums paid by borrowers on a particular pool of loans; in return, Twin Rivers purportedly agrees to assume a portion of the insurer's risk with respect to the loans involved.

64.   In fact, under these carefully crafted excess of loss reinsurance agreements, little or no risk is actually transferred from the primary insurer to Twin Rivers in exchange for a portion of borrowers' premiums. The actual risk, if any, transferred to Twin Rivers is not commensurate with the premiums it extracts from the private mortgage insurers.

65.   Under its reinsurance contracts, Twin Rivers established a separate trust fund for each mortgage insurer into which the mortgage insurer deposited the contractually-determined

15

ceded portion of the premiums that it collected from borrowers. *Id. See also* Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements" at p. 4, attached hereto as Exhibit A, discussing the use of a trust fund.

66.     Twin Rivers is facially required, pursuant to its contracts with the private mortgage insurers, to maintain through, *inter alia*, capital infusions and ceded premiums, each trust fund's net assets at a level required by state law to fund claims made under the reinsurance contracts.

67.     Upon information and belief, concurrent contractual provisions also provide that Twin Rivers and Defendants will not be required to infuse the trust with funds should it fall below specified capital requirements.

68.     Upon information and belief, the trust agreements that support each reinsurance agreement provide that there is no recourse to assets beyond those in the trust accounts for the payment of reinsurance losses.   Twin River's potential exposure for payment of reinsurance claims is limited to the amount held in the trust account established for the mortgage insurer— effectively insulating the reinsurer and its affiliates from liability for failing to maintain the trusts adequately to pay claims.

69.     Consequently, the private mortgage insurance providers have no monetary recourse against Defendants to ensure that the trusts are sufficiently funded on an ongoing basis in order to cover actual or expected losses under the reinsurance contracts.   Such recourse is found in true reinsurance contracts.

70.     SunTrust has admitted that its liability under the reinsurance agreements is limited to the assets held in the trust accounts by publicly stating that "if claims exceed funds held in the trust accounts, the Company does not intend to make additional contributions beyond future

16

premiums earned under the existing contracts." SunTrust Banks, Inc. 2009 Form 10-K Annual Report (filed February 23, 2010), at p. 134. *See also* SunTrust Banks, Inc. 2008 Form 10-K Annual Report (filed March 2, 2009), at p. 8 ("If claims exceed funds held in the trust accounts, Twin Rivers does not expect to make additional contributions beyond future premiums earned under the existing contracts.").

71.    SunTrust's captive reinsurance arrangements did not establish valid reinsurance between Twin Rivers and the private mortgage insurers.

72.    As reflected in Table 1 below, from the beginning of 2004 through the end of 2008, Twin Rivers collected from private mortgage insurers over $168 million as its "share" of borrower's private mortgage insurance premiums.  In contrast, its "share" of paid insured losses during this time period was zero:

| YEAR | PREMIUMS RECEIVED | LOSSES PAID |
|------|-------------------|-------------|
| 2008 | $58,800,000 | $0 |
| 2007 | $37,700,000 | $0 |
| 2006 | $27,081,000 | $0 |
| 2005 | $25,484,000 | $0 |
| 2004 | $19,752,000 | $0 |
| TOTAL: | $168,817,000 | $0 |

73.    As reflected in Table 2 below, during 2009, SunTrust paid a relatively small amount of losses; however, due to the structure of the trust agreements associated with each reinsurance contract, the premiums received by Twin Rivers far exceeded this amount.

| YEAR | PREMIUMS RECEIVED | LOSSES PAID |
|------|-------------------|-------------|

| 2009[3] | $27,835,000 | $7,555,000 |
| --- | --- | --- |

74.     According to its SEC filings, SunTrust ceased writing new mortgage reinsurance business in 2009. *See* SunTrust Banks, Inc. 2008 Form 10-K Annual Report (filed March 2, 2009), at p. 28. However, as reflected in Table 2, SunTrust continues to receive premiums from books of loans included within the captive reinsurance program prior to 2009.

75.     As HUD noted during its recent testimony by Assistant Secretary for Regulatory Affairs and Manufactured Housing Gary M. Cunningham before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

76.     The tens of millions of dollars collected by SunTrust through its captive reinsurer have clearly not been commensurate to its actual risk exposure. The Company has received tens of millions of dollars in ceded premiums, while bearing little or no risk of loss.

77.     In reality, SunTrust's captive reinsurance arrangements were and are sham transactions for collecting illegal kickbacks in return for referring private mortgage insurance business to certain insurers.

78.     The money SunTrust collected through its captive reinsurer far exceeded the value of the services, if any, it performed. There was no real transfer of risk or, at least, not a commensurate transfer of risk given the "price paid" by, or the sheer amount of premium ceded to, the reinsurer. The amounts paid were simply disguised kickbacks to SunTrust for the referral

---

[3]      Table 2 does not include ceded premiums and paid losses with respect to United Guaranty Residential Insurance Company. Plaintiffs' investigation is ongoing.

of borrowers to private mortgage insurers.

79.     These arrangements tend to keep premiums for private mortgage insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders. In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage *and* private mortgage insurers' unlawful kickbacks to lenders.

80.     Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers. As a result, private mortgage insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers.

<u>**CLASS ACTION ALLEGATIONS**</u>

81.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of a class consisting of all persons who obtained residential mortgage loans originated and/or acquired by SunTrust and/or its affiliates between January 1, 2004 and the present and, in connection therewith, purchased private mortgage insurance and whose loans were included within SunTrust's captive mortgage reinsurance arrangements (the "Class").

82.     The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

83.     The Class is so numerous that joinder of all members is impracticable.

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

85.     Plaintiffs' claims are typical of the claims of the Class.

86.     There are questions of law and fact common to the Class, including but not limited to:

(a)     Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

(b)     Whether payments to SunTrust's captive reinsurer were *bona fide* compensation and solely for services actually performed;

(c)     Whether payments to SunTrust's captive reinsurer exceeded the value of any services actually performed;

(d)     Whether SunTrust's captive reinsurance arrangements constituted unlawful kickbacks from private mortgage insurers;

(e)     Whether SunTrust accepted a portion, split or percentage of borrowers' private mortgage insurance premiums other than for services actually performed; and

(f)     Whether Defendants are liable to Plaintiffs and the Class for statutory damages pursuant to RESPA § 2607(d)(2).

87.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.   Twin Rivers' reinsurance agreements were not entered into for each individual borrower; rather, Defendants' reinsurance arrangements covered *pools* of loans for each private mortgage insurer with whom Twin Rivers contracted.   *See* SunTrust Banks, Inc. 2009 Form 10-K Annual Report (filed February 23, 2010), at p. 134.

88.     The same common issues predominate with respect to all members of the Class, regardless of whether their loans were originated by SunTrust or acquired from third-party lenders.   Regardless of whether SunTrust or a third-party lender made the initial referral to the

private mortgage insurer, Defendants' conduct violates Sections 8(a) and (b) of RESPA, as described herein.

89.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have no claims antagonistic to those of the Class.  Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

90.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants.

91.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

92.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

93.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and

efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Violation of RESPA, 12 U.S.C. § 2607)

94.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

95.     Throughout the Class Period, SunTrust provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

96.     The amounts received by SunTrust through its captive reinsurance arrangements constituted "things of value" within the meaning of RESPA § 2602(2).

97.     Plaintiffs and the Class obtained federally-related residential mortgage loans through SunTrust and collectively paid hundreds of millions of dollars for private mortgage insurance premiums in connection with their real estate closings.

98.     Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to Twin Rivers under carefully crafted excess of loss reinsurance agreements.

99.     The millions of dollars in premiums accepted from private mortgage insurers: (a) were not for services actually furnished or performed; and/or (b) exceeded the value of such services.

100.    The millions of dollars accepted by SunTrust through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements with private mortgage insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers. Such practice violated RESPA, 12

U.S.C. 2607(a).

101.    In connection with transactions involving federally-related mortgage loans, SunTrust accepted a portion, split or percentage of charges received by private mortgage insurers for the rendering of real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b).  The money paid by private mortgage insurers to SunTrust and accepted by SunTrust through its captive reinsurer was a portion, split or percentage of the private mortgage insurance premiums paid by SunTrust's customers.  Twin Rivers participated in the scheme and served as the direct party to which the split was paid. Twin Rivers agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiffs and the Class.

102.    Plaintiffs and the Class were, in fact, harmed by Defendants' unlawful kickback scheme.

103.    Plaintiffs and the Class were, as a matter of law, entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes. Congress has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 760-61 (3d Cir. 2009) ("In sum, it is clear to us that the plain, unambiguous language of [RESPA] section 8(d)(2) indicates that damages are based on the settlement service amount with no requirement that there have been an overcharge.").  Plaintiffs allege that Defendants have accepted unlawful kickback payments and/or an unearned portion of settlement service charges in violation of RESPA— allegations and claims completely distinct and separate from whether the price they paid for settlement services was excessive.

104.    Second, through not necessary to prevail on their claims, Plaintiffs and the Class were, in fact, overcharged for mortgage insurance.  Congress has already determined that the *aggregate* effect of an unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate the costs consumers pay for real estate settlement services and/or reduce competition among settlement service providers.    Thus, kickbacks and unearned fees unnecessarily and artificially inflate settlement service charges. Under SunTrust's scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to SunTrust's captive reinsurer that far exceeded the value of any services performed and, were also, in fact, illegal referral fees.

105.    Defendants therefore violated RESPA, 12 U.S.C. 2607.  Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

106.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

### COUNT TWO
### (Unjust Enrichment/Disgorgement)

107.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

108.    Plaintiffs have conferred a substantial benefit upon Defendants which has been appreciated by Defendants.  During the Class Period, SunTrust has wrongfully collected tens of millions of dollars as its unlawful split or share of the private mortgage insurance premiums paid by Plaintiffs and the putative Class members.

24

109.    The purported reinsurance premiums ceded to Twin Rivers were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiffs and the Class.

110.    As a result of Defendants' unjust enrichment, Plaintiffs and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

111.    Further, Plaintiffs and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## TOLLING OF STATUTE OF LIMITATIONS

112.    Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule.  For Plaintiffs and putative Class members whose claims accrued prior to one year preceding the commencement of this action, equitable tolling is available under RESPA and should apply.  Plaintiffs and the members of the putative Class could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.  Further, Defendants knowingly and actively concealed the basis for Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.  For these reasons, any delay by the members of the putative Class whose claims accrued prior to one year preceding the commencement of this action was excusable.

113.    Due to the complex, undisclosed and self-concealing nature of SunTrust's scheme to collect illegal kickbacks from private mortgage insurers, Plaintiffs and the putative Class members whose claims accrued prior to one year preceding the commencement of this action did not possess sufficient information or possess the requisite expertise in order to enable them to

discover the true nature of Defendants' captive reinsurance arrangements.

114.   This complex action is dissimilar to a simple type of RESPA case where, for example, an attentive borrower may determine—from a careful examination of his HUD-1 settlement statement—that he or she was overcharged for a settlement service or that too much money is being paid to his or her lender, real estate agent, title insurer or other settlement service provider.  Rather, the conduct described herein occurs behind closed doors, with a wispy trail virtually impossible for the average homeowner to follow.

115.   Plaintiffs were able to discover the underlying basis for the claims alleged herein only with the assistance of counsel.  Plaintiffs and the putative Class members had no basis upon which to investigate the validity of the undisclosed payments to Twin Rivers for purported reinsurance.  Plaintiffs' and the putative Class members' delay was excusable because they did not discover, and reasonably could not have discovered Defendants' conduct as alleged herein absent specialized knowledge and/or assistance of counsel.

116.   Further, SunTrust engaged in affirmative acts to conceal the facts and circumstances giving rise to the claims asserted herein.[4]  SunTrust used its form mortgage documents, disclosures of affiliated business arrangements, and the entire artifice of a seemingly legitimate business arrangement, to affirmatively mislead Class members about the relationship between the reinsurer and the lender, Twin Rivers and SunTrust, and to represent that, rather than a kickback or unearned fee, any payments exchanged between the affiliated businesses or given to them from a third-party (here, the private mortgage insurers) through referral,  were for

---

[4]   Notably, a recent Third Circuit decision brings into question whether there need be an independent act of concealment to support tolling under RESPA.  In *Drennan v. PNC Bank, NA (In re Comty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.)*, 622 F.3d 275, 307 (3d Cir. 2010), the Third Circuit stated in a footnote, "Though we do not resolve the question in this case, we note that the Settling Parties' theory of fraudulent concealment—*i.e.*, that fraudulent concealment requires some further act than the failure to disclose information that would reveal the fraudulent nature of origination or title fees, or misrepresenting the nature of those fees—would effectively render equitable tolling in the RESPA, TILA, or HOEPA context a dead letter." (internal citations omitted).

actual services rendered.

117.   For instance, to borrowers who paid for private mortgage insurance directly, SunTrust provided—buried within their loan closing documents—a form entitled "Mortgage Guaranty Insurance Disclosure," a sample of which is attached hereto as Exhibit C. This form affirmatively represented that "an affiliate of your mortgage lender assumes a portion of the MI risk" and that premiums ceded to the captive reinsurer are "in exchange for its agreement to share or reduce the mortgage insurer's risk or mitigate its losses." To borrowers who paid for private mortgage insurance indirectly in the form of a higher interest rate on their mortgage loans, SunTrust provided a form entitled "Lender Paid Private Mortgage Insurance," a sample of which is attached hereto as Exhibit D.  This form made no mention whatsoever of SunTrust's captive reinsurance arrangements.   Pursuant to RESPA § 2604(c) and the accompanying regulations set forth in 24 C.F.R. 3500.7, if SunTrust required the use of a particular provider of settlement service, it was obligated to describe the nature of any relationship between SunTrust and such provider.

118.   The putative Class members did not possess sufficient information to even put them on notice of the true nature of SunTrust's captive reinsurance arrangements.  The average homebuyer is not an insurance expert.  Simply being told that SunTrust may enter into captive reinsurance relationships is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his rights under RESPA may be violated.  SunTrust intentionally designed any disclosure that it provided to its borrowers in such a manner as to conceal from them information sufficient to put them notice of the underlying basis for their claims.  The putative class members were not put on notice of SunTrust's wrongdoing.  For instance, SunTrust did not disclose to borrowers that its

captive reinsurance arrangements were lawful only if they involved adequate assumption of risk by Twin Rivers. Notably, the "Mortgage Guaranty Insurance Disclosure" form fails to mention either Cherokee or Twin Rivers by name. SunTrust concealed information that could have put the putative Class members on notice that there was inadequate assumption of risk by Twin Rivers.

119. SunTrust borrowers would have been more than hard pressed to fully discover the true contours of Defendants' multifarious scheme because, upon information and belief, captive reinsurance companies incorporated in "captive-friendly" states such as Vermont and South Carolina (domiciles of Cherokee and Twin Rivers, respectively) are not required to file with the NAIC the type of detailed annual reports usually required of commercial insurance companies. *See, e.g.*, S.C. Code Ann. §§ 38-90-25 and 38-90-35 (providing that information submitted by South Carolina-domiciled captive reinsurance companies is confidential and, absent a court order, may not be made public by the director of insurance without the company's consent); *See also* Janis Mara, *Industry News, Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes*, March 7, 2005, http://www.alta.org/indynews/news.cfm?newsID=2571 ("The annual reports and actuarial reports of Vermont captives are protected by the state's confidentiality laws and cannot be accessed without a court order by anyone other than a regulator."). Thus, even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain information on SunTrust's captive reinsurer. One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a case.

120. The putative Class members exercised due diligence by fully participating in their loan transactions. Because of Defendants' actions and because of the nature of the reinsurance scheme, the absent putative Class members were not put on notice of Defendants' wrongdoing

despite exercising due diligence.

121.    SunTrust provided misleading information to Plaintiffs and the Class, thus affirmatively acting to conceal its unlawful kickback scheme.  By funneling kickbacks through Twin Rivers and representing that such payments were for services actually performed, rather than referral fees, SunTrust acted to conceal and prevent Plaintiffs from discovering the underlying basis for this action.  Any delay by the absent putative Class members is excusable and, accordingly, Plaintiffs and the Class contend that it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any Class member.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.    This action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.    The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.    Plaintiffs and the Class be awarded statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.    An order granting Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and expenses;

E.    An order granting Plaintiffs and the Class restitution of all improperly collected reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class; and

F.    An order granting Plaintiffs and the Class such other, further and different relief

as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated:  February 25, 2011                    Respectfully submitted,


**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**

_JHM6596_

Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Terence S. Ziegler, Esq.
Joshua C. Schumacher, Esq.
Michelle A. Coccagna, Esq.
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BERKE, BERKE & BERKE**
Andrew L. Berke, Esq.
420 Frazier Avenue
Chattanooga, TN  37402
Telephone: (423) 266-5171
Facsimile: (423) 265-5307

**BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER LLP**
Alan R. Plutzik, Esq.
2125 Oak Grove Blvd., Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

***Attorneys for Plaintiffs***

EXHIBIT A

**Proposed EITF Issue**

*Title*:   Risk Transfer in Mortgage Reinsurance Captive Arrangements

**References**

- FASB Statement No. 60, *Accounting and Reporting by Insurance Enterprises*
- FASB Statement No. 113, *Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts*
- FASB Staff Implementation Guidance - Accounting for Reinsurance: Questions and Answers about Statement 113
- AICPA Statement of Position 98-7, *Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risk*
- EITF 93-6, *Accounting for Multiple Year Retrospectively Rated Contracts by Ceding and Assuming Enterprises*

**Issues**

Mortgage lenders have established wholly-owned insurance captives for the purpose of reinsuring mortgage insurance underwritten by mortgage insurers on mortgages originated by the lender. The issues are:

1. Whether FAS 113, *Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts*, or another model applies to these reinsurance contracts.
2. If FAS 113 applies, what is a reasonable standard for evaluating risk transfer for these particular contracts?

The issues are relevant to both mortgage insurers and mortgage lenders, many of whom are SEC registrants.

**Background**

1. An issue has been brought to the attention of the AICPA relating to risk transfer on mortgage reinsurance contracts between mortgage insurers (MI) and mortgage reinsurance captives (reinsurer), wholly-owned subsidiaries of mortgage lenders. There is no consistent practice among the MIs or mortgage lenders, or their advisors, as to the model or criteria for evaluating risk transfer on these contracts. The AICPA has established a Task Force to address the issue. Task Force members are listed in Appendix B.

2. Mortgage Insurance - The purpose of mortgage insurance is to protect lenders from default-related losses on conventional first mortgages made to home buyers who make a down payment of less than 20 percent of the purchase price. Private mortgage insurance companies

insure against the losses associated with defaulted loans by guaranteeing payment to the lender of the top 20 to 30 percent of the claim amount. In effect, the mortgage insurance company shares the risk of foreclosure with the lender.

A claim amount filed with the mortgage insurer generally includes principal and delinquent interest due on the loan, legal expenses incurred during foreclosure, the expense of maintaining the home and any advances the lender made to pay taxes or insurance. Generally, after a lender has instituted foreclosure and acquired title to the property, it can submit a claim to the insurance company.

Mortgage insurers operate within a conservative risk-to-capital ratio, with capital guidelines established by state insurance departments. Insured risk is defined as the percentage of each loan covered by an insurance policy. Private mortgage insurers must operate within 25-to-1 ratio of risk to capital, which means they set aside $1 of capital for every $25 of risk they insure. Generally, the existing captive mortgage reinsurance arrangements require the captive mortgage reinsurer to maintain a risk-to-capital ratio of a minimum of 10-to-1.

3.   Under a captive contract, a MI enters into a reinsurance contract with a wholly-owned subsidiary of a mortgage lender to reinsure a portion of the mortgage insurers' risk. The lender shares in the profits or losses of the MI on the mortgage loans reinsured with the captive. Mortgage insurance profits in the 1990's have benefited from low mortgage default rates. The policies are typically excess contracts where a loss up to a specified aggregate limit over the MI's retention is assumed by the reinsurer. While most contracts are excess, a few quota share contracts have been written wherein the reinsurer proportionately shares in all losses with the MI.

4.   The contracts, first written in 1996, have evolved, as have the interpretations of risk transfer considerations. The vast majority of the contracts have common terms, however, contracts are negotiated and certain variations in terms exist. Risk transfer considerations on these contracts have received considerable discussion among the public accounting profession and their clients and, at present, significantly different views exist as to whether the FAS 113 model applies and, if the case, what criteria should be used for evaluating contracts under FAS 113. Accordingly, different parties can use decidedly different criteria in evaluating risk transfer on the same policy. Different conclusions and accounting may result when the MI is audited by one firm and the captive reinsurer by another.

5.   There are a number of interested parties to these contracts including the lender, MI, insurance and banking regulators, and purchasers of mortgages in the secondary market. Except for regulators, these parties are among those represented on the AICPA Task Force submitting this paper. The Task Force strongly supports the Emerging Issues Task Force providing

guidance as to what model and criteria should be used to determine if there is sufficient risk transfer in these contracts.

6. The dollar amount of mortgage insurance premiums that have been reinsured through these captives and which may ultimately be dividended back to the mortgage lender has grown significantly over the years. Based on an informal review of the 1999 Private Mortgage Insurance Industry data, the most recent year public information is available, captive mortgage insurance arrangements were used on approximately 30% of private mortgage insurance written. It is estimated that this increased during 2000 and will increase again in 2001. During 1999, more than $100 million in reinsurance premiums were ceded under captive mortgage reinsurance arrangements. It is forecasted that this amount doubled during 2000 and will increase again in 2001. During 2000, home mortgage originations approximated $1 trillion of which more than $160 billion was covered by private mortgage insurance. The programs will continue to build as additional years' activity is added to the contracts. Most of the major US mortgage lenders participate in the reinsurance programs through captive insurers.

7. Most of the major US mortgage lenders with reinsurance captives have domiciled the captive in the State of Vermont. Captives domiciled in Vermont must maintain $250,000 in shareholder capital by regulatory mandate. Contract structures addressed in this paper are those typically written by captives domiciled in Vermont.

8. There is a difference in view as to whether mortgage reinsurance is within the scope of FAS 113. FAS 113 applies to all insurance enterprises to which FAS 60 applies. FAS 60 specifically excluded mortgage insurance from its principal accounting guidance.

9. While the contracts have a standard structure, certain aspects of the contracts create significant differences in interpretation as to the application of the risk-sharing model. A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years. With certain restrictions, the contract is cancelable at any time by either party; otherwise it is automatically renewable in perpetuity and additional book years would be added to the contract with the respective premium ceded to the captive. Under the contract with the MI, the captive establishes a trust fund for the benefit of each MI. Trust funds for all book years for the particular MI cross-collateralize the entire reinsured obligation to the MI. The trust fund balance changes as additional book year activity occurs. The trust fund is monitored to ensure capital is consistent with current exposures. Quarterly, the captive is required to ensure the trust fund is maintained to equal the greater of a percentage (typically 10%-20%) of the current cumulative loss exposure for all book years or 100% of loss reserves, including a contingency reserve. There is no obligation to the MI on the part of the captive beyond the contractual obligation to fund the trust fund. If a reinsurer fails to make a capital deposit or fails to maintain adequate minimum capital requirements, there are typically contractual steps

specified to rectify the situation. Most commonly, there is a timeframe to allow the reinsurer to correct the deficiency (typically 30 days). At the end of 30 days, if no resolution has occurred, the contract is automatically terminated either on a "cut-off" or "run off" basis, depending upon the contract. With "cut-off", premiums cease to be ceded, risks cease to be transferred and the contract obligations revert back to the MI. In a "run-off" situation, only new business stops, the prior business continues under the original terms of the contract. In these situations, the captive may be required to maintain minimum capital in excess of reserves within the trust as specified by the contract. Any trust fund assets will be distributed to the ceding company or to the reinsurer in accordance with the contract.

10. The use of a trust fund structure to maintain capital and required reserves was motivated in large part by the needs of the ceding primary MI. In order to obtain statutory financial statement credit for reinsurance balances due, a ceding MI is generally required by state insurance regulators to secure these amounts via a trust fund arrangement, a letter of credit provided by a qualified financial institution or funds held on deposit. Of these alternatives, only the trust fund mechanism conforms to the MI eligibility requirements adopted by the Federal Home Loan Mortgage Corporation. For this reason and various other reasons, the trust fund has become the vehicle of choice within the MI industry for meeting regulatory requirements. To date, all captive MI reinsurance agreements that have been executed incorporate a trust fund structure due to Vermont regulatory and other requirements. The trust fund functions as a mechanism for the Vermont regulators to ensure minimum capital is maintained.

11. The trust fund is designed to provide the ceding MI with security in (at least) two fundamental ways. First, the structure effectively forces the captive to collateralize reinsured risk exposures at levels consistent with or exceeding standard MI industry reserve requirements. Second, the structure serves to create a protective "firewall" for the ceding MI to the extent that the exposure of the trust fund assets is solely limited to losses associated with loans reinsured on the ceding MI's behalf. In this respect, the trust fund assets are restricted for the sole use and benefit of the ceding MI. These assets cannot be drawn down to cover losses associated with loans reinsured on behalf of other MIs. In theory, the collateralization and firewall security features will enable the ceding MI to obtain optimal regulatory capital relief from state insurance regulators and optimal risk-based capital relief from Wall Street credit rating agencies.

12. At the same time, however, as discussed above, the trust fund structure also imposes limitations on the ability of the ceding MI to recover losses. Under standard industry practices, the reinsurance agreement restricts the amount of losses recoverable by the ceding MI to the amount of assets maintained in its particular trust fund. The ceding MI cannot attach other assets maintained by the captive in order to recover losses. Trusts established for the benefit of MI's within the captive structure are not cross-collateralized. In addition, subject to the requirements of certain captive regulators, including those in Vermont, the ceding MI cannot attach the core regulatory capital that was used to initially fund the captive. Therefore, the use of the trust fund has the practical effect of limiting the loss exposure of the

captive.  Moreover, the captive is protected from potential insolvency since its core regulatory capital is not exposed to reinsurer risk of loss.

13. The Task Force has considered whether EITF 93-6, *Accounting for Multiple Year Retrospectively Rated Contracts by Ceding and Assuming Enterprises*, is applicable to these contracts and has concluded it is not.  Either party may terminate the mortgage reinsurance contract at any time (with 90 days notice) and there is no additional obligation for either party related to adjustable contract features.  Per EITF 93-6, "a retrospectively rated contract that could be canceled by either party without further obligation is not covered by this Issue."

14. The Task Force has concluded the contract is a series of individual book year contracts, renewable indefinitely.  The basis for this conclusion is the contract may be terminated by either party at any time with minimal notice and the number of book years that ultimately will be included in the contract is unknown.

15. The Task Force has also considered whether these are short or long-duration contracts under FAS 60 and has concluded that the accounting model for short-duration contracts seems more applicable to risk exposures under mortgage guaranty insurance and reinsurance.

16. Different interpretations exist regarding whether the trust fund functions (a) as an aggregate limit of coverage that is changing annually with the addition of a new book year or (b) as collateral to the ceding company and serves to maintain adequate capital commensurate with risk exposures. Depending upon this decision, the contract would be viewed either as (a) a contract evaluated annually on a prospective basis as new book activity occurs or (b) a "series of single book years" each evaluated separately.

17. Under the "series of single book years" scenario there is a difference in view as to (a) whether the trust fund limitations should be considered in a FAS 113 cash flow analysis and (b) whether external capital must be deposited in the trust fund for each book year or whether retained earning of previous book years can be considered capital for subsequent book years without the need to deposit additional external capital.

18. If adequate risk transfer is not present, SOP 98-7, *Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risks*, would be applied. According to paragraph 9 of SOP 98-7, "fees to be retained by the insurer or reinsurer, irrespective of the experience of the contract" would be excluded from a deposit liability or asset. Because all premiums paid pursuant to the mortgage reinsurance contract are non-refundable, recognition of a deposit liability by the reinsurer would not be appropriate, i.e., there is no obligation for the reinsurer to return any portion of the premium to the ceding company, except in the form of losses paid. Instead, such fees would be earned over the life of the contract similar to premium recognition under FAS 60. The Task Force agreed the recognition of revenues would be the same whether or not a contract is assessed to have adequate risk transfer. However, under a deposit method, revenue would likely be classified as something other than premiums and losses under the contract would be reflected

as other expenses. Recognition of the revenue as something other than premiums would be an indication to regulators that legal requirements may not be met and the consequences would be significant both from a regulatory and legal perspective (see following point).

19. When entering into the contracts, the lenders must comply with Section 8 of the Real Estate Settlement Procedures Act (RESPA). The US Department of Housing and Urban Development, in providing guidance on RESPA, has stated the position that "arrangements are permissible under RESPA if payments to the reinsurer: (1) are for reinsurance services actually furnished or for services performed and (2) are bona fide compensation that does not exceed the value of such services." Premiums must be commensurate with the risk assumed and "there must be a real transfer of risk". RESPA does not include a reference to authoritative literature for evaluating risk transfer. The legal community, in part, has looked to accounting literature and accounting and actuarial conclusions for guidance. Considerations affecting permissibility of contracts under RESPA are not within the scope of this paper.

**Example of Standard Contract Terms**

*Term*
Reinsurance under a contract is established by "book year" and is typically for a 10-year term. For example, in a 1999 contract, all MI policies written during 1999 would be considered "book year 1" and premiums would be ceded for a 10-year run-off term. Additional "book years" (2000, 2001, etc.) could also be added to this contract. With certain restrictions, the contract is cancelable at any time, but otherwise is automatically renewable in perpetuity. The reinsurer would typically have contracts with several MI's.

*Reinsured Losses*
The MI will cede to the reinsurer losses in excess of an established aggregate "first loss percentage amount of the original risk insured" for each book year. Any loss in excess of the first loss percentage amount will be assumed by the reinsurer up to a specified limit (i.e. the reinsurer's risk is capped). The MI retains risk in excess of the reinsurer's layer. For example, a contract may be structured as a 5/5/25, which means the MI keeps losses up to the first 5% of risk, the reinsurer assumes the next 5%; the MI cedes 25% of premium to the reinsurer. Layers of coverage and premium ceding percentages vary by contract.

*Ceding Commissions*
Certain contracts stipulate a ceding commission will be paid to the MI to reimburse the MI for acquisition costs. The majority of the excess contracts are written without a ceding commission.

*Trust Fund*
A trust fund is established by the Reinsurer for each MI, the assets of which are used to pay reinsured losses.

- *General concept:* The trust fund is cross-collateralized for all book years for the respective MI. Reinsurer exposure is limited to the amount in the trust fund.
- *Additions to the trust:* Capital contributions made by the reinsurer; premiums paid by the MI to the reinsurer over the 10-year term of the book year; interest income earned on the monies in the trust.
- *Reductions from the trust:* Reimbursements for administrative expenses and premium/state/federal income taxes paid to reinsurer; reinsured losses paid to the MI; distributions paid to the reinsurer in excess of minimum capital requirements as permitted by the contract.

*Capital Contributions*
Quarterly, the captive is required to ensure the trust fund is maintained to equal the greater of a percentage (typically 10%-20%) of the current cumulative loss exposure for all book years or 100%-102% of loss reserves, including a contingency reserve.

*Termination Provisions*
*Run-off:* Either party may put the contract into run-off, at any time, by providing notice to the other party. During run-off, no new policies can become subject to the contract, however, all other terms and conditions shall continue to apply with respect to current book years.

*Cut-off:* If, at any time, (a) the funds in the trust are insufficient to pay amounts due or (b) the ceding company is unable to obtain funds from the trust, then the agreement terminates. Upon termination, there is no further legal obligation to the captive as obligations revert back to the MI.

*Distributions*
Generally, when the trust fund meets an established dollar criteria, distributions can be made from the trust to the reinsurer. These amounts could then be paid as a dividend to the mortgage lender with insurance department approval.

**Differing Views**

As previously mentioned, there is diversity as to the model and criteria for evaluating risk transfer on these contracts. Different views, presented as questions, follow. A decision tree is attached as Appendix A.

Question 1
   *Must a FAS 113 risk transfer analysis be performed to support risk transfer?*

*Yes.* While FAS 60 specifically excludes mortgage insurance from the principal insurance guidelines, FAS 113 does not specifically exclude mortgage insurance. MIs consider FAS 113 to be relevant guidance for direct business.

*No.* Mortgage reinsurance is not within the scope of FAS 113 as FAS 113 applies to all insurance enterprises to which FAS 60 applies. Paragraph 6 of FAS 60 specifically excludes mortgage guaranty insurers from its principal insurance guidance. Accordingly, mortgage guaranty reinsurance should not be considered within the purview of FAS 113. Additionally, even if one were to use FAS 113 by analogy, risk transfer analyses are generally not performed on contracts with non-refundable premiums as revenue and expense recognition would generally be the same whether or not deposit accounting were applied, i.e., revenue would be earned over the life of the contract.

To support the proper reflection of premiums by the reinsurer, the contracts must ensure adherence to regulatory requirements. Since the main concern of regulators is whether premiums charged are commensurate with the loss exposure assumed by the reinsurer, an actuary should be used to render an opinion as to whether premiums represent a reasonable charge for the potential exposures covered under the contract.

Question 2
   *Should the limitations of the trust fund structure be considered in a FAS 113 cash flow analysis and, if so, how would it affect the analysis?*

*Yes.* The trust fund is a significant element of the contract that must be modeled. It is assumed the captive will not fund the trust upon notification the fund balance is below minimum capital requirements and, as such, the trust fund effectively functions as a cap on losses at any given point in time.

In general, it is expected that the external capital plus new premiums and interest income will be more than adequate to maintain the minimum capital. In the event that an adverse loss scenario were to occur, the contract provides an option to the captive of not funding the trust and allowing the contract to terminate. There is no legal recourse on the part of the ceding company beyond terminating the contract in the event that the captive fails to meet the minimum capital requirements. Given that there is limited unrestricted capital in the captive to provide additional funding to the trust and there is no legal obligation on the part of the

captive's parent to provide funding, it is reasonable to expect that the captive will elect the option built into the contract to not provide additional funding. Based on the facts outlined above it is appropriate to perform the cash flow analysis assuming that no additional capital will be contributed by the captive to the trust fund. In this manner, it is determined if and when a contract's cash flows revert to either a cut-off or run-off scenario, consistent with Q&A 18 to FAS 113.

*No.* Effectively, the trust fund limitation is akin to a capital limitation as opposed to a coverage limitation. The contract specifically requires the captive to ensure the trust is adequately funded on a quarterly basis. Therefore, at the inception of the contract, one would expect the captive to comply with this contractual requirement. Thus, the trust should not be considered a cap on losses within a FAS 113 cash flow analysis but is similar to any practical capital limitation whereby the ceding company is obligated to pay claims, as a contingent obligor, when the reinsurer is either unable to or chooses not to pay a claim. Capital limitations are not considered in FAS 113 risk transfer analyses. The trust fund functions as collateral to the ceding company to ensure the collectibility of reinsured losses and is necessary for the ceding company to recognize reinsurance recoverables as admitted assets within their statutory financial statements. Additionally, from the insurance regulator's perspective, the trust fund acts as a means for the captive to maintain adequate capital that is commensurate with its risk exposures.

As evidence that the trust fund functions more like a capital rather than a coverage limitation, the trust fund is reassessed quarterly to ensure adequate capital is maintained to fund current loss exposures. Distributions cannot be made from the trust fund unless balances exceed the minimum requirements. If the reinsurer incurs losses in a given quarter whereby trust assets fall below minimum capital requirements as stipulated in the reinsurance agreement, most contracts require the reinsurer to replenish the trust but provide a remedy of run-off or cut-off if they fail to do so. Therefore, the only circumstance by which the trust serves to limit losses would occur when the captive fails to fund the trust, as is stipulated in the contract. Such a situation is analogous to a reinsurer depleting its surplus and failing to obtain additional capital to meet its obligations. This potential issue is a matter of capital adequacy to the reinsurer and collectibility of reinsurance recoverables to the mortgage insurer.

A view has been put forth if the captive has no intention of funding the trust in periods of adverse loss, the situation could raise accounting issues. This view represents that, in performing a FAS 113 risk transfer analysis, it is unlikely that the 9a test of FAS 113 (the reinsurer assumes significant insurance risk under the reinsured portions of the underlying contracts) could be met if it is expected that the reinsurer will not participate in losses within the stated coverage limits. For example, the 5% excess 5% coverage in the contract may effectively be limited to 2% excess 5% and thus the reinsurer is not sharing the ceding company's losses above 7%. As such, if the 9a test cannot be met, there is no reason to perform a 9b (reasonable possibility of a significant loss) test. Others believe that if it can be demonstrated that there is a reasonable possibility of a significant loss satisfying the 9b requirement, implicitly 9a is satisfied. It is not necessary for the entire loss layer to be at risk

to achieve risk transfer under FAS 113. Only sufficient capital needs to be at risk. Depending upon the pattern of loss development, losses for a particular book year may, in fact, utilize the entire 5% x 5% layer.

Question 3

*Does the change in trust fund balances give rise to a significant contract amendment at the beginning of each new book year?*

*Yes.* The trust fund functions as an aggregate contract coverage limit that changes significantly at the beginning of each book year. The trust fund balance defines the loss limit of the contract. Accordingly, it functions as a significant amendment to the contract that requires a new risk transfer analysis be performed at the beginning of each book year using cash flows of the current book year and prior year's run-off on a prospective basis. The assumption is that a significant modification; as contemplated by paragraph 33 in FAS 113 and further clarified in EITF, Appendix D, topic D-34, question 6, has been made to the initial contract (thus requiring re-analysis). The parties have (a) agreed to continue the contract and (b) a new policy year is being added with additional exposures and new loss limits.

*No.* The contractual terms of the trust fund are not changed from book year to book year and, therefore, should not be viewed as an effective change in the contract requiring a new cash flow analysis at the beginning of each book year.

Question 4

*Must external capital be deposited in the trust fund for each book year?*

*Yes.* The FAS 113 risk transfer analysis is performed on a book year basis and, accordingly, external capital from the reinsurer's parent must be deposited in the trust fund for each book year. This approach is consistent with viewing the contract as a series of individual book year contracts. Retained earnings from previous book years are not considered capital to support other book years, consistent with treating each book year separately. It is also consistent with viewing the trust fund as established to maintain capital adequacy and collateral for book year exposures assumed. If capital is not deposited for each book year, the amount of capital at risk relative to reinsurance exposures becomes significantly smaller as additional book years are added since premiums and retained earnings are not considered capital for the FAS 113 risk transfer analysis.

In a contract where external capital is deposited for each book year, the contract is evaluated in its entirety at inception and is not re-analyzed unless there are amendments to the contract, or the underlying assumptions in the analysis are materially different than actual experience.

*No.* Capital is required to be deposited for the first book year. For subsequent book years, capital is required to be maintained at a specified level in order to continue to reinsure new business. Retained earnings are considered as capital in each subsequent book year in the

risk transfer analysis. Since the trust fund balance supports all book years, claim activity may require the deposit of external capital to the trust to satisfy minimum capital requirements.

The cross-collateralization of the trust fund and the modeling of retained earnings as capital in support of all book years requires a re-evaluation of cash flows supporting FAS 113. Practice varies in that certain professionals model each book year cash flows for FAS 113 while others model the initial book year of a contract for FAS 113 and reanalyze the contract only if trust fund activity significantly affects available capital levels.

Question 5
*Should all trust fund cash flows be considered in the risk transfer analysis?*

*Yes.* The trust fund is a secured interest to the MI and functions as the collecting point for funds supporting reinsurer exposures to the MI. The only funds that can be used to pay claim losses are those that flow through the trust. Accordingly, the trust is considered the point for evaluating cashflows and risk transfer. Risk transfer is evaluated as the present value of cash flows between the reinsurer and the trust relative to the present value of the premium stream. The cash flows include the capital contribution from the reinsurer and the disbursements to the reinsurer. These disbursements contemplate the ceded premiums and trust investment income less claims losses, expenses and taxes. Anything that represents a diminution of the trust balance has to be contractually permitted by the MI and, accordingly, taxes and expenses are viewed as cash flows in evaluating risk transfer. Additionally, the trust fund balance would be modeled to determine if and when the contract is terminated due to depleted assets and to determine assets available to be disbursed. If the risk transfer analysis is not performed at the trust level, satisfactory risk transfer on a book year would be demonstrated without any external capital being at risk. This does not seem reasonable.

*No.* The trust fund is viewed as belonging to the reinsurer and the traditional FAS 113 approach is applied. Risk transfer is considered to be a function of cash flows solely between the ceding company and the reinsurer. Investment income, expenses, taxes, would not be considered in evaluating risk transfer. Paragraph 10 of FAS 113 states the risk transfer consideration "shall be based on the present value of all cash flows between the ceding and assuming enterprises". Question 16 of the FAS 113 question and answers makes it clear taxes and other operating expenses are not to be considered in the calculation. However, the trust fund balance would be modeled to determine: (a) if and when the contract is terminated due to depleted assets, (b) the level of capital available to support book year exposures, and (c) available assets for distribution.

**Application of FAS 113 Risk Transfer Analysis
to *Mortgage Reinsurance* Decision Tree**                    **Appendix A**

**Is EITF 93-6 Applicable?**

**NO**, contracts are cancelable
by either party at anytime.

**Must a FAS 113 Cash Flow Analysis be
prepared to support Risk Transfer?**

**NO**, however, need to ensure regulatory
requirements are met to recognize          **YES**

**Do you consider the trust fund
structure in the FAS 113 Cash Flow**

**YES**, consider trust fund as a cap
on losses.          **NO**, it is a capital mechanism. Model
each book year separately and do not
consider trust fund as a cap on losses.

**Does the change in trust fund balances give
rise to a significant contract amendment at
the beginning of each new book year?**

**YES**, model cash flows of current book year
together with run-off of prior book years.          **NO**, model cash flows for each
book year separately.

**Must new capital be infused at the beginning of
each book year to support risk transfer?**

**YES**          **NO**, model the trust fund as a limit on
losses within the analysis.

**Do you model all trust cash flows as opposed to only
those between the ceding and assuming companies?**

**YES**          **NO**

04/06/10

Appendix B

### AICPA Accounting Standards
### Mortgage Captive Reinsurance Task Force
### Correspondence Distribution List 2000-2001

| Name | Telephone/Fax/E-mail |
|------|----------------------|
| William J. Bawden, Chair<br>PricewaterhouseCoopers LLP<br>Royal Trust Tower TD Centre, Suite 3000<br>Toronto, Ontario M5K 1G8<br>CANADA | 416-947-8970<br>Fax: 416-947-8956<br>bill.bawden@ca.pwcglobal.com |
| Edward F. Bader<br>Arthur Andersen LLP<br>One Financial Plaza<br>Hartford, CT  06103 | 860-280-0601<br>Fax: 860-280-0888<br>edward.f.bader@us.arthurandersen.com |
| James A. Betts<br>Ernst & Young LLP<br>3200 Beechleaf Court, Suite 700<br>Raleigh, NC 27604 | 919-981-2904<br>Fax:  919-981-2997<br>andy.betts@ey.com |
| Jay Matalon<br>Ernst & Young LLP<br>1285 Avenue of the Americas, 8th floor<br>New York, NY 10019-6018 | 212-773-2468<br>Fax: 212-773-1203<br>jay.matalon@ey.com |
| Ken Bjurstrom<br>Milliman & Robertson, Inc.<br>15800 Bluemond Road, Suite 400<br>Brookfield, WI | ken.bjurstrom@milliman.com |
| Richard G. Browne<br>Deloitte & Touche LLP<br>1700 Market Street<br>Philadelphia, PA 19103-3984 | 215-246-2519<br>Fax: 215-448-2255<br>rbrowne@deloitte.com |
| Paul S. Davenport, Jr.<br>Corporate Services Group Manager<br>Republic Mortgage Insurance Company<br>190 Oak Plaza Boulevard<br>Winston-Salem, NC  27105 | 336-661-4244<br>Fax: 336-744-8960<br>Paul_Davenport@rmic.com |
| Gary J. Egnasko<br>PricewaterhouseCoopers LLP<br>161 Parker Road<br>Framingham MA  01702 | 508-370-9645<br>Fax: 508-405-1710<br>gary.j.egnasko@us.pwcglobal.com |
| John Gaines, FCAS, MAAA<br>AVP - Structured Products<br>United Guaranty Corporation<br>230 N. Elm St.<br>Greensboro, NC 27401 | 336-333-0276<br>Fax:  336-412-0929<br>jgaines@ugcorp.com |

**Appendix B**

| Name | Telephone/Fax/E-mail |
|---|---|

**Name**                                                    **Telephone/Fax/E-mail**

Joseph P. Gencarella                          401-528-2642
KMPG LLP                                          Fax:  401-421-6870
600 Fleet Center                                  j.gencarella@kpmg.com
Providence, RI  02903

Ron D. Kessinger,  Exec. VP & CFO        336-723-1282
Triad Guaranty Insurance                      Fax: 336-917-2648
101 South Stratford Road, Suite 500        rkessinger@tgic.com
Winston-Salem, NC  27104

Deborah Lambert                                301-656-0040
Johnson Lambert & Co.                          Fax: 301-656-0518
7500 Old Georgetown Road                    dlambert@jlco.com
Bethesda, MD  20814

Patrick Sinks, Sr. VP and Controller        414-347-6809
Mortgage Guaranty Insurance                Fax: 414-347-6382
   Corporation                                        Patrick_Sinks@mgic.com
MGIC Plaza, P.O. Box 488
Milwaukee, WI 53201

Charlton Wilder, Vice President              212-622-3536
Chase Insurance Group                        Fax: 212 622-3966
380 Madison Avenue, 13th Floor            Charlton.Wilder@chase.com
New York, NY 10017

*STAFF LIAISON:*                                  212-596-6160
Kimberly K. Hekker, Technical Manager    Fax: 212-596-6064
AICPA – Accounting Standards                khekker@aicpa.org
1211 Avenue of the Americas, 6th Flr.

New York, NY  10036

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*                        \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Craig C. Anderson                              860-280-0525
Arthur Andersen LLP                            Fax: 860-280-0888
One Financial Plaza                              craig.c.anderson@us.arthurandersen.com
Hartford, CT  06103

Sherri L. Schickert                              414-212-1647
PricewaterhouseCoopers LLP                Fax: 414-212-1880
100 East Wisconsin Avenue, Suite 1500   Sherri.l.schickert@us.pwcglobal.com
Milwaukee, WI 53202

Michael C. Schmitz                              262-784-2250
Milliman & Robertson, Inc.
15800 Bluemond Road, Suite 400          Fax: 262-784-6388
Brookfield, WI 53005-6069                     mike.schmitz@milliman.com

EXHIBIT B



U. S. Department of Housing and Urban Development
Washington, D. C. 20410-8000

August 6, 1997

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

Mr. Sandor Samuels
General Counsel
Countrywide Funding Corporation
155 N. Lake Avenue
Pasadena, California 91109

Dear Mr. Samuels:

Last year the Department of Housing and Urban Development
(the Department) sought from you information on the captive
reinsurance program of Amerin Guaranty Corporation (Amerin) with
Countrywide Home Loans (Countrywide) and its affiliated
reinsurer, Charter Reinsurance (Charter). You then requested
that the Department clarify the applicability of Section 8 of the
Real Estate Settlement Procedures Act (RESPA) to captive
reinsurance programs. For the reasons set forth below, we have
concluded that, so long as payments for reinsurance under captive
reinsurance arrangements are solely "payment for goods or
facilities actually furnished or for services actually
performed," these arrangements are permissible under RESPA. See
paragraph 8(c)(2) of RESPA, 12 U.S.C. § 2607(c)(2). The
following details the facts concerning captive reinsurance
programs as we understand them, relevant law, and how the
Department will scrutinize these arrangements to determine
whether any specific captive reinsurance program is permissible
under RESPA.

I.   BACKGROUND

A typical captive reinsurance arrangement involves a
mortgage lender acting in concert with a fully licensed
reinsurance affiliate of the mortgage lender and an unaffiliated
primary mortgage insurer. The sole purpose of the reinsurance
affiliate is to reinsure loans which the affiliated mortgage
lender originates and which the unaffiliated, primary mortgage
insurance company insures. The primary mortgage insurer and the
reinsurer enter into a contract under which the primary insurer
agrees to pay the reinsurer an agreed upon portion of the
mortgage insurance premiums for loans originated by the lender
and insured by the primary insurer. The lender, therefore, has a
financial interest in having the primary insurer in the captive
reinsurance program selected to provide the mortgage insurance.

Premiums paid for the reinsurance may be net of an agreed upon "ceding commission," which represents the reinsurer's share of the costs of administering the book of insured business.

Under the contract between the primary insurer and the reinsurer, the reinsurer posts capital and reserves satisfying the laws of the state in which it is chartered and may also establish an additional security fund to ensure that, when a claim against the reinsurer is made, funds will exist to satisfy the claim. In exchange for a portion of mortgage insurance premiums (minus a ceding commission, if applicable) to be paid by the primary insurer, the reinsurer obligates itself to reimburse the primary insurer for an agreed portion of claims that may require payment under the contract. Under different reinsurance arrangements, the reinsurance obligations generally take one of two forms. The first is an "excess loss" arrangement, under which the primary insurer pays, and is solely responsible for, claims arising out of a given book of business up to a predetermined amount, after which the reinsurer is obligated to reimburse the primary insurer's claims up to another predetermined amount. Thereafter, the primary insurer is solely responsible for claims in excess of the reinsurer's tier of losses on a given book. A second type of contract is the "quota share" contract, under which the reinsurer would bear a portion of all insured losses.

Under captive arrangements of which the Department is aware, some degree of disclosure is provided to the consumer about the arrangement and some opportunity is accorded to the consumer to choose whether or not to have the loan insured through a captive reinsurance program.

## II.  LEGAL ANALYSIS

Subsection 8(a) of RESPA provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). "Thing of value" is further described in the Department's regulations as including "without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a

3

future date, the opportunity to participate in a money-making program...."  24 C.F.R. § 3500.14(d).  In addition, subsection 8(b) prohibits the giving or receipt of any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service "other than for services actually performed."  12 U.S.C. § 2607(b).  These prohibitions against paying for referrals and against splitting fees are very broad and cover a variety of activities.

Subsection 8(c) of RESPA sets forth various exemptions from these prohibitions.  It provides, in relevant part, that nothing in section 8 shall be construed as prohibiting "(2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed."  12 U.S.C. § 2607(c)(2).

The Department's view of captive reinsurance is that the arrangements are permissible under RESPA if the payments to the reinsurer:  (1) are for reinsurance services "actually furnished or for services performed" and (2) are bona fide compensation that does not exceed the value of such services.

The rationale behind this two-step analysis is that in instances in which a lender selects the mortgage insurer, including under a captive reinsurance arrangement, the lender's actions would constitute a referral of loans to a mortgage insurer, by influencing the borrower's selection of his or her mortgage insurer.  See 24 C.F.R. § 3500.14(f) (definition of "referral").  If the lender or its reinsurance affiliate is merely given a thing of value by the primary insurer in return for this referral, in monies or the opportunity to participate in a money-making program, then section 8 would be violated; the payment would be regarded as payment for the referral of business or a split of fees for settlement services.  If, however, the lender's reinsurance affiliate actually performs reinsurance services and compensation from the primary insurer is bona fide and does not exceed the value of the reinsurance, then such payments would be permissible under subsection 8(c).  Conversely, any captive reinsurance arrangement in which reinsurance services are not actually performed or in which the payments to the reinsurer are not bona fide and exceed the value of the reinsurance would violate section 8 as an impermissible referral fee.

4

A.   <u>Analysis of Specific Captive Reinsurance Arrangements</u>

The Department will analyze captive reinsurance arrangements
to determine if the arrangements comply with RESPA.  Factors
which may cause the Department to give particular scrutiny to an
arrangement and cause it to apply the test set forth in Part
II(B) of this analysis include, but are not limited to, the
following:

1.   The amount charged directly or indirectly to the
consumer for mortgage insurance in a captive program is greater
than the amount charged to the consumer for mortgage insurance
not involving reinsurance for a similar risk.

2.   The costs (premiums minus a ceding commission, if
applicable) paid to the captive reinsurer are greater than the
cost for comparable non-captive reinsurance available in the
market.

3.   The lender restricts its mortgage insurance business in
whole or to a large extent to a primary mortgage insurer that has
a reinsurance agreement with the lender's captive reinsurer.

4.   Any major secondary market institution refuses to
purchase mortgages insured under a particular captive reinsurance
agreement or places special conditions on such purchases.

5.   Any credit rating agency reduces the rating of the
primary mortgage insurer in whole or in part because of
agreements with captive reinsurers.

6.   Any State regulatory body questions the adequacy of the
reserves maintained by the primary mortgage insurer or the
captive reinsurer.

7.   The primary insurer's agreement to reinsure is
conditioned on the affiliated lender's agreement to refer all of
or a predetermined volume of its mortgage insurance business to
the primary insurer, or the terms of the agreement (such as the
percentage of the premium per loan reinsured that is paid to the
reinsurer by the primary insurer) fluctuate depending on the
volume of the primary insurance business referred by the lender
to the primary insurer.  The presence of either of these
conditions makes it more likely that at least a portion of the
compensation paid to the reinsurer is for the referral of
mortgage insurance business.

8.  Adequate consumer disclosure is not provided.  The Department believes that consumers would be well served by a meaningful disclosure[1] and a meaningful choice[2] for consumers about having their loans included in a captive reinsurance program.  A demonstrated willingness to provide such a disclosure may indicate that the arrangement is designed to provide real reinsurance.

The Department does not consider any of these eight factors to be determinative of whether an arrangement merits scrutiny by the Department, nor does it regard the absence of any of these factors to be determinative that further scrutiny is not merited.  In addition, as noted in Part II(B), the Department may consider these eight factors in applying the test in Part II(B), to the extent applicable.

B.  Test for Whether a Captive Reinsurance Arrangement Violates RESPA

Where the Department scrutinizes a captive reinsurance arrangement, it will apply a two-part test for determining whether the arrangement violates RESPA.  The Department will first determine whether the reinsurance arrangement meets three requirements that establish that reinsurance is actually being provided in return for the compensation.  If one or more of the requirements is not met, the inquiry will end, and the arrangement will be regarded as an impermissible captive reinsurance arrangement under RESPA.  If all of the requirements are met, the Department will determine whether the compensation exceeds the value of the reinsurance.  To facilitate its analysis, the Department may use information obtained from the lender, the primary insurer, the captive reinsurer, or other sources, including data on the rate, magnitude, and timing of default losses and mortgage insurance payments and any other

---

[1]  A meaningful disclosure would reveal that the captive reinsurance arrangement exists, that the lender stands to gain financially under the arrangement, and that the consumer may choose not to have his or her insurance provided by an insurer in such an arrangement.

[2]  A meaningful choice whether to participate would provide the consumer an easy, non-burdensome opportunity to opt out by, for example, indicating a preference one way or the other on a form.

information necessary to undertake the analysis and may exercise
its subpoena authority pursuant to 24 C.F.R. part 3800 to obtain
such information.

1.   Determining that Reinsurance is Actually Being Provided in
     Return for the Compensation

     To determine that a real service--reinsurance--is performed
by the reinsurer for which it may legally be compensated, the
following requirements must be satisfied:

     a.   There must be a legally binding contract for
reinsurance with terms and conditions conforming to industry
standards.

     b.   The reinsurer must post capital and reserves satisfying
the laws of the state in which it is chartered and the
reinsurance contract between the primary insurer and the
reinsurer must provide for the establishment of adequate reserves
to ensure that, when a claim against the reinsurer is made, funds
will exist to satisfy the claim.  Unless the reinsurer is
adequately capitalized and adequate reserves (which may include
letters of credit or guarantee arrangements) and funds are
available to pay claims, real services are not being provided.

     c.   There must be a real transfer of risk.  The reinsurance
transaction cannot be a sham under which premium payments (minus
a ceding commission, if applicable) are given to the reinsurer
even though there is no reasonable expectation that the reinsurer
will ever have to pay claims.  This requirement for a real
transfer of risk would clearly be satisfied by a quota share
arrangement, under which the reinsurer is bound to participate
pro rata in every claim.  The requirement could also be met by
excess loss arrangements, if the band of the reinsurer's
potential exposure is such that a reasonable business
justification would motivate a decision to reinsure that band.
Unless there is a real transfer of risk, no real reinsurance
services are actually being provided.  In either case, the
premiums paid (minus a ceding commission, if applicable) must be
commensurate to the risk, as discussed in Part II(B)(2).

     In evaluating these requirements, the Department may also
consider the factors in Part II(A), to the extent relevant.  If
any of the requirements in this Part II(B)(1) is not met, the
arrangement will be regarded as an impermissible reinsurance
arrangement under RESPA.  If any of the requirements is not met,
the "service" being compensated would appear to be the lender's
referral of business to the mortgage insurer, which RESPA
prohibits.

2.  Determining that the Compensation Paid for Reinsurance Does
    Not Exceed the Value of the Reinsurance

    If the requirements in Part II(B)(1) for determining that
reinsurance is actually being provided in return for the
compensation are met, the Department will then determine whether
the compensation paid for reinsurance does not exceed the value
of the reinsurance.  The Department will evaluate whether the
compensation is commensurate with the risk and, where warranted,
administrative costs.  The Department's evaluation of this
requirement may:

    --   Compare, using relevant mathematical models, the risk
borne by the captive reinsurer with the payments provided by the
primary insurer.

    --   Analyze the likelihood of losses occurring, the
magnitude and volatility of possible losses, the amount of
payments received, the timing of the payments and potential
losses, current market discount rates, and other relevant
factors.

    --   Take into account the relative risk exposure of the
primary lender and the captive reinsurer.

    --   Consider the extent to which the lender or the firm
controlling the captive reinsurer is shielded from potential
losses by inadequate reserves and a corporate structure that
segregates risks.

    --   Examine other financial transactions between the
lender, primary insurer, and captive reinsurer to determine
whether they are related to the reinsurance agreement.

    --   Examine whether the ceding commission is commensurate
with the administrative costs assumed by the primary insurer.

    In making this evaluation,  the Department may also consider
the factors in Part II(A), to the extent relevant.  If the
Department concludes that the compensation paid for the
reinsurance exceeds the value of the reinsurance pursuant to the
analysis in this Part II(B)(2), the arrangement will be regarded
as an impermissible reinsurance arrangement under RESPA and the
payments exceeding the value of the reinsurance will be
considered a referral fee or unearned fee.

III. CONCLUSION

    In setting forth this analysis, the Department notes the
trend in the mortgage market toward increased diversification of
risk.  The Department welcomes such trends to the extent that

8

such arrangements increase the availability of mortgage credit. Where RESPA would not preclude such arrangements, the Department would generally support them.

The Department believes the system of mortgage insurance and reinsurance is not necessarily comparable to other types of settlement services. Thus, the Department could analyze other settlement service programs differently, depending on the facts of the particular program.

I trust that this guidance will assist you to conduct your business in accordance with RESPA.

Sincerely,

Nicolas P. Retsinas
Assistant Secretary for
Housing-Federal Housing
Commissioner

cc: Mr. Randolph C. Sailer II
    Senior Vice President and General Counsel
    Amerin Guaranty Corporation
    200 East Randolph Drive, 49th Floor
    Chicago, IL  60601-7125

EXHIBIT C

# Mortgage Guaranty Insurance Disclosure

Borrower(s):   **DIANE FORREST**

Property:

Loan Number:

## MORTGAGE GUARANTY INSURANCE DISCLOSURE

You have applied for a loan which requires private mortgage guaranty insurance ("MI") provided by mortgage insurers, reimburses a lender for certain losses the lender may incur if you fail to make the payments on your loan as required. While MI does not provide direct monetary benefit to you, it does allow you to obtain a mortgage loan with a lower down payment. MI is typically required for any loan that does not have government mortgage insurance when the down payment is less than 20%.

Mortgage Insurers evaluate their total risk on all MI in force and may, from time to time, enter into agreements with other parties to modify or share this risk or mitigate their losses. One kind of arrangement is called "captive reinsurance," in which an affiliate of your mortgage lender assumes a portion of the MI risk and is paid by the mortgage insurer a portion of the premium charged for the MI on your loan. Or, the mortgage insurer may include your loan in some other kind of risk allocation arrangements between it and another party or parties. These agreements, whether they provide for captive reinsurance or some other arrangement may require the mortgage insurer to make payments to the entity agreeing to modify or share its risk, or mitigate its losses, by using any source of funds that the mortgage insurer may have available (which may include funds obtained from MI premiums). Thus, in exchange for its agreement to share or reduce the mortgage insurer's risk or mitigate its losses in accordance with any of these agreements your mortgage lender, any purchaser of the note you executed evidencing your mortgage loan a re-insurer, any other third party, or any affiliates of any of the foregoing, may be paid directly or indirectly amounts that derive from (or might be characterized as) a portion of your payments for MI. Please note, however, that:

    (A) any such agreements will not affect in any way the approval of your mortgage loan, the terms of your mortgage loan, or the amounts you have agreed to pay for MI; they will not increase the amount you will owe for MI or extend the period of time that you will be required to pay for MI, and they will not entitle you to any refund of earned MI premiums; and

    (B) any such agreements will not affect the rights you have, if any, with respect to MI under the federal Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the MI, to have the MI terminated automatically, and/or to receive a refund of any MI premiums that were unearned at the time of such cancellation or termination.

Please be advised that you may elect to exclude your loan from any MI risk allocations agreements.

---

Mortgage Guaranty Insurance Disclosure
Proprietary W0211                                    Page 1 of 2                                    84218MU 02/04



\* + 0 2 4 1 5 5 7 6 3 6 + 0 0 5 F + 1 + 2 \*

## ACKNOWLEDGEMENT

I hereby acknowledge that I have received and read this Disclosure. I understand that, unless I check the box below and mail this form to the specified address, I agree that MI covering my loan may be reinsured or included in another risk allocation arrangement, as described above, and that my lender, any subsequent holder of my loan, a re-insurer, any other third party, or any affiliate of any of the foregoing, may receive amounts that derive from (or might be characterized as) a portion of my payments for MI.

Borrower **DIANE FORREST**

Borrower

Borrower

Borrower

If you want the MI on your mortgage loan to be excluded from any of the arrangements described above. You must check the box below and mail this Disclosure to following address:

Attn: Mortgage Reinsurance Department, P.O. Box 26703, Richmond, VA 23261-0703. A copy of this signed Disclosure should also be returned to your settlement agent.

☐    I want the MI on my loan excluded from any of the possible arrangements described above.

Borrower **DIANE FORREST**

Borrower

Borrower

Borrower



*+0241557636+005F+2+2*

EXHIBIT D

Loan No.:

# LENDER PAID PRIVATE MORTGAGE
# INSURANCE NOTICE

Applicant(s): KATHY L MULL                    Property:

You have applied for a loan that requires private mortgage insurance. Private mortgage insurance protects the Lender and others against financial loss in the event you default on your loan. **"Lender paid mortgage insurance"** means private mortgage insurance that is required in connection with your loan and is paid by the Lender or someone other than you.

The Federal Homeowner's Protection Act of 1998 requires the Lender to disclose to you the following:

1.  Lender paid mortgage insurance differs from applicant paid mortgage insurance, in that lender paid mortgage insurance may not be canceled by you, while applicant paid mortgage insurance could be either (1) canceled by you on the date the principal balance of the mortgage loan is first scheduled to reach eighty percent (80%) of the original value of the property, or (2) canceled by you on the date the principal balance **actually** reaches eighty percent (80%) of the original value of the Property. Applicant paid private mortgage insurance automatically terminates on the date the principal balance of the loan is first scheduled to reach seventy-eight percent (78%) of the original value of the Property.

2.  Lender paid mortgage insurance usually results in a residential mortgage having a higher interest rate than it would in the case of applicant paid mortgage insurance. Lender paid mortgage insurance terminates only when the residential mortgage is refinanced, paid off, or otherwise terminated.

3.  Lender paid mortgage insurance and applicant paid mortgage insurance both have benefits and disadvantages.

    The following is a generic analysis of the differing costs and benefits over a ten-year period, assuming prevailing interest and property appreciation rates. This analysis is based upon a $50,000 loan amount with a 30-year fixed-rate mortgage with a loan-to-value ratio of ninety-five percent (95%). (Note: Actual fees and charges may vary according to the private mortgage insurance plan, loan-to-value ratio, loan amount and loan type.)

|  | Lender Paid Private Mortgage Insurance | Applicant Paid Private Mortgage Insurance |
|---|---|---|
| Interest Rate | 8.5% | 8.0% |
| P&I Monthly Payment | $384.46 | $366.88 |
| PMI Monthly Payment | 0 | $32.50 |
| Total Paid over ten (10) years | $46,135.20 | $47,925.60 |
| Cancellation of PMI | Only by refinancing, selling or paying off lien | Yes, under certain circumstances |
| Refund of Premium | No | Yes, under certain PMI plans |

Lender Paid Private Mortgage Insurance Notice
The Compliance Source, Inc.
www.compliancesource.com

Page 1 of 2

Application
01125MU 06/99 Rev 02/07
©2007, The Compliance Source, Inc.



+ 0 2 7 3 6 4 . 6 6 6 1 + 0 0 6 D + 1 + 2

4.  If you itemize expenses for federal income tax purposes, lender paid mortgage insurance may be tax deductible. Consult your tax advisor.

### ACKNOWLEDGMENT OF RECEIPT

I hereby acknowledge receipt of this Lender Paid Private Mortgage Insurance Notice and further acknowledge that I understand its provisions. Words used in this Lender Paid Private Mortgage Insurance Notice mean and include the plural and vice versa.

*Kathy Mull .5/7/08*

_____          _____
KATHY L MULL     (Applicant) (Date)                          (Applicant) (Date)


_____          _____
                 (Applicant) (Date)                          (Applicant) (Date)


Lender Paid Private Mortgage Insurance Notice                                                Application
The Compliance Source, Inc.                          Page 2 of 2                  01125MU 06/99 Rev 02/07
www.compliancesource.com                                             ©2007, The Compliance Source, Inc.



+ 0 2 7 3 6 4 6 6 6 1 + 0 0 6 D + 2 + 2